**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| NORTH SAILS GROUP, LLC, a Delaware limited liability company, Plaintiff, v. TEAM NEW ZEALAND LIMITED, a New Zealand company, and STEPHEN COLLIE, an individual, Defendants. | No. ____________________ **COMPLAINT** |

Plaintiff North Sails Group, LLC ("North Sails"), for its complaint against Defendants, Team New Zealand Limited ("TNZ") and Stephen Collie ("Collie"), respectfully alleges:

## <u>INTRODUCTION AND BACKGROUND</u>

1. North Sails—the world's preeminent sailmaker and supplier of sails for the America's Cup—brings this action against Defendants for stealing North Sails' proprietary information and inventions, patenting them as their own, and then weaponizing the resulting patents to threaten North Sails and its customers on the eve of the 38th America's Cup. North Sails seeks correction of the inventorship of U.S. Patent 12,110,089 ("the '089 Patent," attached as Exhibit A) to add at least one North Sails inventor; a declaration that North Sails is the true owner of the misappropriated patent portfolio, including the '089 Patent, its worldwide counterparts, and all related patents (collectively, "the Collie Portfolio"); and damages for breach of contract, unjust enrichment, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), and tortious interference under Connecticut common law. In the alternative, North

Sails seeks a declaration that the ’089 Patent is invalid and unenforceable. To the extent that North Sails is granted ownership of any of these patents, it intends to provide a royalty-free license to all America’s Cup teams.

*The Parties to this Proceeding*

2. Plaintiff North Sails, a company founded in 1957, is the undisputed global leader in the design and manufacture of racing sails. Founder Lowell North was an engineer educated at the University of California, Berkeley and a world-renowned sailor. Lowell North was an Olympic medal winner, winning both gold and bronze medals, and he claimed the World Championship title in International “Star” Class racing five times, a record that remains unbeaten to this day. Lowell North himself is also a member of the Sailing World’s Hall of Fame.

3. North Sails is now one of the world’s leading sailmakers, with over one hundred locations and service centers spread across the globe and a reputation for constant innovation. North Sails was the first company in the industry to adopt standardized cutting patterns, the first to use computers and software systems in sail design, the first to employ automated cutting machines, and the first to manufacture three-dimensionally printed sails. In particular, the software developed by North Sails allows it to calculate the loads and deformations to which a sail is subjected and to design and produce sail products of a quality superior to any competitor.

4. North Sails’ excellence in designing and producing sails for competitive sailing is unrivalled. Every America’s Cup Defender and Challenger since 1987 has used North Sails’ sails. In the most recent edition of the America’s Cup, held in Barcelona, Spain, every team chose to compete with North Sails’ “3Di” sails because of their cutting-edge design and quality.

5. North Sails is also a world leader in the design and production of sails for Olympic and one-design boat classes, as well as manufacturing cruising sails relied upon by

sailing enthusiasts around the world.

6. North Sails' leadership in the sailing industry is as a result of its technical superiority, decades of investment in research and technological development, a body of strictly confidential proprietary knowledge, including the NS Design Suite software (North's proprietary sail and rig engineering software platform) and 3Di production technology, the skill of North's sail designers, and a culture of collaboration with the world's top racing teams (particularly in the context of the America's Cup), as explained in greater detail below in relation to the events that gave rise to this dispute.

7. Defendant TNZ, founded in 1993, is a prominent presence in elite sailing and a major player in the modern history of the America's Cup. Racing also under the name Emirates Team New Zealand, the team has achieved several America's Cup victories (1995, 2000, 2017, 2021, 2024), as well as remarkable results in high-performance foiling competitions and offshore racing.

*The America's Cup*

8. The America's Cup is the oldest trophy in international sport and represents the pinnacle of yacht racing. The first contest was held in 1851, when the New York schooner *America* defeated a fleet of British vessels in a race around the Isle of Wight. That victory gave the event its name and marked the beginning of more than 170 years of high-level competition. Organized as a duel between the defending club (the "Defender") and a challenging club (the "Challenger"), the America's Cup is today preceded by a series of qualifying regattas in which multiple teams compete against one another to determine the single official Challenger that will face the Defender in the final match.

9. Over time, the event has evolved from traditional displacement boats to today's

high-performance "flying" monohulls, becoming a showcase for the most advanced design, technology, and strategy, both in the America's Cup Match itself and in the intense qualifying series that precede it.

10. The next edition of the America's Cup, also known as the 38th America's Cup or "America's Cup 38," will begin in May 2027, with the qualifying regattas and will continue through to the final match in the following months. The so-called Preliminary Regattas, which serve as key preparation events for the teams ahead of the main competition, are already underway.

11. America's Cup 38 will take place in the Gulf of Naples, marking the very first time this major competition will be held in Italy. It will also be the first time that, in the Challenger Selection Series, the AC75 boats—*i.e.,* the revolutionary 75-foot vessels equipped with movable side arms with foils and ballast, which lift almost completely out of the water and "fly" across the surface with blistering acceleration, speeds many times faster than the wind, and spectacular maneuvers—will race together on the same racecourse in the new "fleet-racing" format rather than in the traditional head-to-head "match racing" format. The seven participating AC75s will therefore compete together in the waters of the Gulf of Naples, creating the greatest showcase of high-performance sailing in what promises to be an event without equal on the yachting calendar.

*The Design and Supply of Sails for the America's Cup*

12. North Sails has been individually chosen as the sailmaker by each team taking part in America's Cup 38, a role it has earned due to its undisputed innovation and quality in the field of high-performance racing sails and its leadership in the sport. Thanks to advanced materials, cutting-edge engineering and continuous innovation in composite sail technologies,

North Sails can meet the high performance and reliability requirements demanded at the very highest levels of the sport. As a result, America's Cup teams rely on North Sails to equip their boats with sails capable of delivering maximum efficiency, control, and speed in the most demanding racing conditions. TNZ also entrusts North with the production of its sails.

13. In the America's Cup, and more generally in international sailing competitions, while responsibility for the design of the boat—including the sails—lies with the individual teams, North Sails provides the teams with its highly sophisticated software and its catalog of materials, built up over years of experience and targeted investment (see also below), as well as its specialized design consultants, assigning each team a dedicated working group that is completely separate from the others and bound by strict confidentiality protocols. This allows all teams virtually unfettered access to the best North Sails has to offer, while allowing the teams to develop unique designs that they hope will give them the competitive edge. The sails are manufactured and supplied by North Sails in accordance with the resulting specifications and design choices, and North Sails guarantees the confidentiality of the solutions adopted until the end of the competition.

14. This confidentiality is obviously essential for the competition. However, under the supply agreements between North Sails and the teams, at the end of each competition, the information that the teams obtained during sail development—thanks to the use of North Sails' equipment, software, confidential information, and know-how—is shared with all participants and with North Sails in a so-called "collective design debrief." This sharing is essential to the model under which North Sails works to produce sails for America's Cup participants; it is justified by the importance of the tools and equipment that North Sails makes available to the teams, and in any case serves the general interest in maintaining a sporting competition in which

the contenders start from the same baseline conditions.

*North Sails Protects its Confidential Information by Restricting Access to the NS Design Suite*

15. As set forth above, North Sails has historically fostered an environment of collaboration with its customers at the highest levels of sailboat racing and specifically the America's Cup. The supplier agreements signed with each customer team at the beginning of each America's Cup cycle grant the teams full access to North Sails' resources and wide freedoms for product creativity. North Sails ensures that each team's sail designs and sail-construction ideas will be kept in strict confidence until the end of the cycle. In exchange, the teams agree to disclose their design and construction concepts to the other teams, in a collective design debrief format, at the conclusion of each America's Cup cycle.

16. North Sails provides the teams, through the North Sails consultants, with access to North Sails' trade-secret, proprietary and confidential information, under confidentiality obligations, through licenses for all teams to make use of North Sails' NS Design Suite software, which software allows all teams to provide their design and specifications to North Sails for the manufacture of the sails using North Sails' proprietary sail-manufacturing techniques and materials.

17. The origins of the NS Design Suite date back to 1977 when North Sails transitioned from shaping broad seams on the floor to generating 2D curves with a computer. The NS Design Suite was founded on advanced mathematical modeling and has grown and improved over the years based on data North Sails has obtained from decades of experience. The NS Design Suite has been maintained as a trade secret by licensing to only a few customers and only under strict confidentiality obligations.

18. The NS Design Suite includes North Sails' analytical programs known as

Flow™/MemBrain™ and VPP™ and North Sails' proprietary sail design programs known as Spiral™ and Spine™ and Warps™. The NS Design Suite includes a catalog of North Sails 3Di tapes that can be used to make sails.

19. The MemBrain and Flow modules, introduced in 1987 and continually developed since, allow North Sails and its consultants to apply the effects of wind pressure by computers virtually to a sail's surface and to calculate the load forces created. North Sails and its consultants virtually pressurize the sail shapes to discover what their flying shape will be in the intended range. The MemBrain and Flow modules work in tandem with the sail shape moving back and forth between them. North Sails and its consultants first analyze the structure in MemBrain and continue by applying pressure to see how the shape deforms when pressure is applied in Flow. North Sails and its consultants continue this feedback "loop" of testing and correcting until they obtain the desired structural integrity and flying shape of the sail.

20. North Sails pioneered 3D sailmaking. North Sails was the first to build sails on a full-size adjustable convex mold. This North Sails-patented process, called 3DL, was the world's dominant performance sailmaking technology.

21. The North Sails 3DL sail-manufacturing process was invented and fine-tuned by North Sails during the 1990s. The 3DL process was covered by patents. At the time, the 3DL process was the only sail-manufacturing system in the world that utilized a full-scale molding process for sail fabrication. North Sails is still the only sail manufacturer using a mold.

22. The North Sails 3DL sails ultimately were replaced by North Sails with a new invention, 3Di sails.

23. North Sails industrialized the machinery, adapted the 3Di concepts to North Sails' 3DL molding processes, and then modified the resin systems and fiber combinations used in the

sails to greatly enhance both the performance and the durability of the 3Di product.

24. For the period of 2008-2011, alone, the product development budget for these sails was approximately $20 million.

25. The 3Di process, as further developed by North Sails, constructs one-piece, 3D-molded membrane sails out of ultrathin spread-filament tapes and thermoset resin. This yields sails that are 30–40% lighter, hold their shape longer, and resist delamination better than sails produced by alternative processes. Instead of a sail being formed by sewing various panels of materials together, it is formed by this process with a sail comprising hundreds of regions, each formed by different combinations of tapes. The characteristics at any single location of the composite sail are the result of the tapes' mechanical properties, their thickness and orientation present at any location, as well as any other additional materials at a location.

26. During the first 3 years of the 3Di development project alone, 2008-2011, North Sails built and ultimately discarded over 700 prototype sails in an effort to understand the effects of combinations of tape construction (fiber type, fiber count, resin type and weight), tape hybridization (combining fibers with differing properties), tape orientation, and total tape weights. This information has been maintained as confidential and as a trade secret by North Sails.

27. Between 2011 and 2018, during the second phase of development of the 3Di sails, North Sails organized multiple-day, on-site workshops for North Sails' most senior sail designers. These workshops focused primarily on discovery of alternative concepts for the tape layouts and fiber type utilization.

28. During this period, North Sails also added the Warps program to the NS Design Suite. Warps was released by North Sails to licensed sail designers with a library of

standardized 3Di taping layout templates. Along with the standardized templates, North Sails offered a small staff of Warps experts to assist sail designers and licensed users of the NS Design Suite when they had ideas for customizing the layouts for a specific sail.

29. North Sails licenses its NS Design Suite to individual sail designers for the purpose of consulting with North Sails and its customers on the design of sails to be manufactured by North Sails—again, under strict confidentiality obligations. North Sails spent over 40 years of hard work and investment to develop the NS Design Suite. These tools and services were made available to TNZ and Collie under obligations of confidentiality.

30. As part of the licensing of the NS Design Suite, licensed sail designers agree by contract that use of the licensed software is for the benefit of North Sails.

31. Relatedly, the historical sharing of North Sails' software, technology, and seconded design staff created an expectation by North Sails that no signatory to these license agreements would attempt to claim exclusivity to any of the designs that resulted from this cooperation and joint development of the sail designs. Likewise, because the materials, design tools, and manufacturing guidelines for all sails had been developed by North Sails, North Sails had an expectation that such sails would continue without the encumbrance of a patent issued to one of the America's Cup teams on a sail design created and developed with North Sails' resources, assistance, and collaboration.

32. Because of these expectations and the expectation of confidentiality, North Sails was willing to spend time and money developing its technology and protecting it from public disclosure, including, for example, the initial $20 million and three years spent developing its 3Di technology for a better sail for use in the America's Cup races, as well as the ongoing development and refinement of the technology since.

*Collie's Access to the NS Design Suite Pursuant to Confidentiality Agreement*

33. Collie had access to the NS Design Suite, and the information contained within, under a signed confidentiality agreement executed by Collie and North Sails on August 18, 2017 (attached as Exhibit B).

34. Under the 2017 Confidentiality Agreement, Collie acknowledged that the NS Design Suite and programs are valuable, confidential, and proprietary information belonging solely to North Sails. The agreement stated that he would not "use … the Programs or disclose any information/data derived there from for any purpose other than the purpose specifically set forth above." Exhibit B, ¶ 2. The sole purpose set forth was to consult with other North Sails designers, to assist in the design of North Sails' clients' sails and optimization of sail/rig combinations for North Sails clients. TNZ was such a North Sails client. Nowhere does the purpose include the filing of a patent application based on information learned from North Sails.

35. Beyond this restriction, Collie agreed that he would not use any of the information "directly or indirectly" derived from his access for the benefit of any entity other than North Sails. *Id.* at ¶ 3. Upon termination of his relationship with North Sails, he was to terminate all use of the NS Design Suite and return to North Sails all information/data derived from the NS Design Suite. Collie has never returned such data or information.

36. Further, Collie "acknowledge[d] and agree[d] that breach by him of his obligation under this Confidentiality Agreement shall cause North [Sails] irreparable injury for which there is no adequate and complete remedy at law…. North [Sails] shall be entitled to … injunctive and other equitable relief." *Id.* at ¶ 5.

*North Sails' Consultant Matt Savage Invents Novel 3Di Tapes*

37. In addition to software inventions and trade secrets, North Sails also developed

inventions and trade secrets relating to material science.

38. For example, by 2018, Matt Savage, a North Sails materials engineer, conceived of new tapes for use in the construction of composite sails using North Sails' 3Di process that made use of a variety of filaments (hereinafter, the "Savage Tapes"). As with North Sails' software, information regarding these tapes was restricted and only made available under obligations of confidentiality. Information regarding them was provided directly and indirectly to users of the NS Design Suite under the terms of confidentiality.

39. These tapes do not utilize materials in their normal manner, i.e., they are not used as yarns or woven fabric. Instead, a tape consists of individual filaments of a material, thinner than a human hair, being placed in parallel straight lines across the length of the tape. Based on the placement and orientations of these tapes, the characteristics of this composite sail will vary across hundreds or more regions of a sail.

40. Among his various inventions, Savage conceived of how to make hybrid tapes useful for 3Di sails, including those with a mix of polyester filaments and aramid or ultra-high molecular weight polyethylene (UHMWPE) filaments, which allowed for making less-stiff sails, including enabling portions of a sail to be many times more elastic than the materials used in composite sails at that time. It was part of his conception that these hybrid tapes be used in sails, expanding the range of material properties that could be made available in a composite sail.

41. Subsequent to this conception, Savage reduced to practice these tapes. These tapes were manufactured and he conducted extensive testing of these tapes. He measured the stress and strain on the tapes and determined what the failure strain was for the individual tapes, he determined relevant mechanical characteristics for these tapes and painstakingly catalogued all these test results regarding these new tapes. The resulting technical information regarding the

mechanical properties of these tapes were added to the materials table that was part of NS Design Suite. By late 2017, there were details in the materials table that showed that there could be a 20 to 25 times difference in stiffness across different types of hybrid tapes suitable for use in the manufacture of composite sails.

42. These material properties were not publicly available, but were specific to the tapes conceived and developed at North Sails by Matt Savage. The information in the material properties tables regarding the tapes were not well-known concepts, nor were they publicly available information. They were North Sails' confidential and proprietary information.

43. As new tapes were identified that were suitable for use in commercial applications, North Sails expanded its proprietary catalog of 3Di tape types in the NS Design Suite. The polyester in combination with aramid or UHMWPE hybrid tapes conceived and developed by Savage were added to the materials table starting November 9, 2017. The tape catalog was only disclosed through use of the NS Design Suite program, under obligations of confidentiality.

*Collie's Violation of his Confidentiality and Related Obligations*

44. As of approximately January 2018, TNZ had engaged North Sails employee Burns Fallow as its sail design consultant. At that time, Collie was a design coordinator for TNZ working with Fallow and other North Sails employees and dealing with coordination of the efforts of other TNZ employees, consultants and contractors, with respect to other aspects of the TNZ boats for America's Cup 36. As an employee of North Sails, Burns Fallow had extensive access to North Sails' confidential and proprietary information regarding sail technology, including details regarding the mechanical properties of the tapes.

45. In January 2018, North Sails held a workshop, referred to as the America's Cup

36 MemBrain workshop, which was created to teach participants how to incorporate the latest North Sails technology into sail designs and to provide an environment for the top North Sails designers to collaborate on ideas before disembarking to their various America's Cup teams.

46. Collie attended the America's Cup 36 MemBrain workshop, and was the only participant not concurrently employed by North Sails. The other participants were all North Sails employees, such as Fallow, who had also been engaged as design consultants for America's Cup teams.

47. As part of the January 2018 America's Cup 36 MemBrain workshop, tape layout templates and use guidelines were shared with all licensed users of the NS Design Suite who were also members of an America's Cup team. This included a TNZ employee, Collie.

48. North Sails made the Savage Tapes, *i.e.,* a new family of high elasticity 3Di tapes that were used to make sails, and added them to the NS Design Suite beginning in 2017. Collie learned of the characteristics and features of the Savage Tapes directly and indirectly through his access to the NS Design Suite and its outputs. Collie also learned of Savage's work, including further details of the characteristics of these tapes, through both of their mutual work with Burns Fallow.

49. On information and belief, TNZ was well aware of the restrictions faced by Collie (and others) with respect to access to the NS Design Suite. The participating teams in the America's Cup, including TNZ, sign supplier agreements, which include access to the NS Design Suite, including the 3Di tapes catalog, to develop and design sails.

50. On information and belief, in 2020, TNZ persuaded Collie to file a patent application which included confidential trade secret proprietary information obtained directly or indirectly from the NS Design Suite, including information on the Savage Tapes, and that

included claims based on Savage's inventions. Technical details in the Collie Portfolio come directly or indirectly from NS Design Suite, including information regarding the Savage Tapes.

*The Improper Origins and Prosecution of the '089 Patent and the Collie Portfolio*

51. North Sails has always relied upon and enjoyed a culture of collegiality, cooperation and trust with the teams and their members who are licensed to use the NS Design Suite. The design debrief at the end of the America's Cup cycles serves as a reset event. North Sails' belief is that this culture of cooperation benefits the sport and all the individuals who invest their time and resources in the sport.

52. While there is often a brief period of reluctance to share hard-won sail design lessons during the design debrief, there was never a case of any team reneging on the agreement to share its design information until TNZ announced it would not abide by its prior agreement to participate and refused to participate in the America's Cup 36 design debrief.

53. At the same time that TNZ refused to participate in the debrief, Collie and TNZ betrayed the trust of the community further by filing a patent application on what they had learned through use of the NS Design Suite for America's Cup 36. In doing so, Collie—with the knowledge of TNZ—violated his confidentiality agreement and misused North Sails' confidential information and inventions to file patent applications naming only Collie as inventor. Now that these applications have matured into a U.S. patent and foreign counterpart patents, TNZ is attempting to gain a competitive advantage in the America's Cup 38, not through sailing skill, but through use of these misbegotten patents.

54. These patents were first filed in the U.S. as Provisional Application 63/127,127 on December 17, 2020, naming Collie as sole inventor. This first application, to which the entire Collie Portfolio claims priority, is U.S. Provisional Application 63/127,127 (the "Provisional

Application”).

55. TNZ and Collie then filed PCT/IB2021/061985, filed on December 17, 2021, which claims priority to the Provisional Application, but the patent specification (including the figures) differs from that in the Provisional Application. Additional North Sails proprietary, trade secret, and confidential information, as well as inventive concepts from Savage, were added by TNZ and Collie in this patent application.

56. U.S. Patent Application No. 18/211,036, entitled “Sail Structure,” was filed on June 16, 2023, claims priority back to the Provisional Application, and issued as the ’089 Patent by the U.S. Patent and Trademark Office on October 8, 2024.

57. On September 4, 2024, TNZ filed U.S. Patent Application No. 18/824,639 as a continuation application to the ’036 application; it claims priority back to the Provisional Application and is still being actively pursued by TNZ.

58. Additional patent applications were filed in Europe, Australia, and New Zealand claiming priority through PCT/IB2021/061985 to the Provisional Application. This includes European Patent No. EP4277841.

59. Each patent of the Collie Portfolio lists Collie as the sole inventor, and Defendant TNZ as the applicant and owner. Yet these patents are based on and include inventions made by Savage, as well as confidential and proprietary information improperly used by Collie, including as a licensee of the NS Design Suite.

60. On information and belief, TNZ, and the TNZ employees involved in the decision to patent were aware of the origin of the disclosures in the Collie Portfolio, specifically that Collie obtained portions of the disclosure from proprietary confidential trade secret information covered by the 2017 Confidentiality Agreement, and that it included Savage’s ideas, including

information regarding the Savage Tapes.

61. On information and belief, TNZ encouraged Collie to include this confidential information in the patent application, including information regarding the Savage Tapes and Savage's inventions.

62. In addition, sails covered by the claims of the '089 Patent were made and sold by North Sails to TNZ beginning in 2019, more than one year before the earliest potential priority date of the '089 Patent.

63. Specifically, North Sails was designing, and selling to TNZ, sails which utilized the Savage Tapes, and embodied the designs of the '089 Patent as far back as at least 2019, more than a year before the earliest claimed priority date for the '089 Patent, for the America's Cup race. Collie and TNZ were aware of and involved in these sales of sails to TNZ in 2019 and onwards. These sails sold by North Sails to TNZ were the basis for the '089 Patent application. These same designs continued to be used by TNZ even in the 2024 America's Cup race in Barcelona. The fact that North Sails was selling sails to TNZ was publicly known.

64. No significant changes were made in the design or manufacture of these sold sails after the claimed priority date. Because these 2019 sails were sold and because they were publicly used, there is no novelty for any of the claims under 35 U.S.C. § 102(a) and the exceptions under § 102(b) do not apply.

65. TNZ, TNZ's employees involved in patent decisions, the patent attorneys, patent agents working on TNZ's behalf, and Collie were aware of these invalidating sales. Yet, they did not disclose to the U.S. Patent and Trademark Office, or any other Patent Office, the sale by North Sails to TNZ of the prior art sails embodying the '089 Patent. Nor did they disclose North Sails' and Savage's contributions to the claimed inventions.

*TNZ's Notice Letters*

66. The long-standing sharing of North Sails' software, technology, and design staff, naturally gave rise to the expectation that no team would attempt to claim exclusive patent rights based on projects developed for participation in the event. Against this background, TNZ has been the center of an unprecedented rift by filing for the Collie Portfolio, refusing to take part in the collective design debrief following the 36th America's Cup, and threatening infringement actions against North Sails and the rival teams.

67. Yet, on July 31, 2026, and on August 25, 2026, TNZ, through its legal counsel, formally warned—in letters (attached as Exhibit C and Exhibit D)—its rival America's Cup teams against using, within the context of the America's Cup 38, sails falling within the scope of protection of the Collie Portfolio, including the '089 Patent, and also warned North Sails itself against taking part in any related activity of design, manufacture or importation into Italy of said sails, asserting that such conduct by North would amount to patent infringement, at least indirect or in concert with the teams. In the August 25 letter specifically, TNZ threatened that it had "the right to take further action without any warning" and threatened possible litigation seeking a preliminary injunction. Exhibit D.

68. TNZ's notice letters arrive at a time when the teams' preparations for the America's Cup 38 are already at a very advanced stage. Given the specific dynamics of the event, its procedures, timelines, and the scale of investment with which the teams and the builders work for this kind of high-profile competition, said letters represent a serious and entirely unprecedented form of intimidation that risks jeopardizing the proper conduct of the sporting competition and, consequently, the substantial investments already made by the numerous public and private players involved in the organization of America's Cup 38.

69. The repercussions for North Sails, which is accused of infringement by TNZ, are obvious. Suffice it to say that the design and construction of each of the sails fitted to the boats in question requires many months of work and the involvement of multiple specialized personnel, at costs of several million dollars.

*North Sails' Goal through this Litigation*

70. North Sails primarily seeks, through this litigation, correction of the inventorship of the '089 Patent to add a North Sails inventor; as well as a declaration that—due to breach of contract by Collie and due to unjust enrichment and unfair business practices by Defendants—North Sails is the true owner of the Collie Portfolio. In the alternative, North Sails seeks a declaration that the '089 Patent is invalid and unenforceable.

71. North Sails' goal through this action is to re-establish a level playing field, and for the America's Cup to be based on sailing skill and not patents. To the extent that North Sails is granted ownership of any valid claim in these patents, it intends to provide a royalty-free license to all of the America's Cup teams.

**PARTIES**

72. Plaintiff North Sails is a Delaware limited liability company having an address of 837 Seaview Avenue, Suite A, Bridgeport, Connecticut 06607.

73. On information and belief, Defendant TNZ is a New Zealand company, having an address of 56 Brigham Street, Freemans Bay, Auckland Central, Auckland 1010, New Zealand.

74. On information and belief, Defendant Collie is a resident of Auckland, New Zealand.

**JURISDICTION AND VENUE**

75. This Court has subject matter jurisdiction of the claims pleaded in this Complaint

pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. §1338 (acts of Congress related to patents), 28 U.S.C. § 1367 (supplemental jurisdiction over pendent state claims), and 28 U.S.C. § 2201 (declaratory judgment). An actual controversy exists between North Sails and Defendants about inventorship and ownership of the Collie Portfolio. Further, an actual and justiciable controversy exists among the parties because TNZ has wrongly and unfairly asserted that North Sails and its customers infringe the '089 Patent relating to the customers' purchase and use of sails manufactured by North Sails.

76. This Court has personal jurisdiction over TNZ under 35 U.S.C. § 293. TNZ is a foreign entity that has not designated a domestic representative that can accept service on its behalf. 35 U.S.C. § 293 provides personal jurisdiction in this court over such foreign entities in disputes affecting the patent or rights thereunder, including disputes of patent inventorship, ownership and validity.

77. This Court has personal jurisdiction over Collie under Fed. R. Civ. P. 4(k)(2). Collie is not subject to any state's courts of general jurisdiction, and exercising jurisdiction is consistent with due process because: Collie entered several agreements with North Sails in the United States, including the August 18, 2017 Confidentiality Agreement; attended North Sails workshops in the United States, including in Bend, Oregon during January 2018; obtained technical information from North Sails employees in the United States; and filed a provisional application with the United States Patent and Trademark Office. Further, and relevant to jurisdiction, Collie's work for TNZ was all related to the America's Cup, which is regulated by a Gift of Trust with the Supreme Court of the State of New York.

78. Venue is proper in this District pursuant to 28 U.S.C. § 1391(c)(3) because Defendants are subject to the Court's personal jurisdiction with respect to this action.

Additionally, venue is proper as to TNZ pursuant to 35 U.S.C. § 293.

**COUNT I – Correction of Inventorship of the ’089 Patent**

79. North Sails incorporates its allegations in all other paragraphs as though fully set forth herein.

80. Savage, a North Sails employee with responsibility for material properties research, application, and data distribution to design staff, collaborated with Defendants on sails embodying the claims of the ’089 Patent and contributed to the conception and reduction to practice of the claimed invention, making Savage an improperly unnamed co-inventor of the ’089 Patent. Savage’s conceptions include the invention of the Savage Tapes, and the conception of using tapes with their specific characteristics, which were disclosed to Collie directly and indirectly through Collie’s use and access to the NS Design Suite.

81. The failure of Savage to be named as an inventor was not due to any deceptive intent of Savage.

82. Therefore, pursuant to 35 U.S.C. § 256, the ’089 Patent should be corrected to name Savage as an inventor of the ’089 Patent.

83. Savage is under an obligation to assign his inventions to North Sails, and has assigned his interest in the Collie Portfolio, including the ’089 Patent, to North Sails. Combined with proper correction of inventorship, this obviates TNZ’s aforementioned assertion of infringement of the ’089 Patent against North Sails and its customers.

**COUNT II – Breach of Contract and Ownership of the Collie Portfolio**

84. North Sails incorporates its allegations in all other paragraphs as though fully set forth herein.

85. North Sails is the owner of the Collie Portfolio by virtue of Collie’s breach of the

2017 Confidentiality Agreement between North Sails and Collie. According to that agreement, Collie was retained by North Sails on a consulting basis "*to assist in the* design of North [Sails] sails, and *the optimization of sail and rig combinations* for North Sails clients." Exhibit B (emphasis in original). In order to accomplish that objective, Collie was allowed access to the NS Design Suite "solely for the purpose of *consulting with other North [Sails] Designers.*" *Id.* (emphasis in original). Collie agreed that he would not use the NS Design Suite "or any information/data derived there from, directly or indirectly, for his personal benefit or the benefit of any person or entity other than North [Sails]." *Id.*

86. Collie breached the 2017 Confidentiality Agreement. He incorporated North Sails' proprietary, trade secret, and confidential information obtained directly and indirectly from NS Design Suite, including details regarding the features of the Savage Tapes, into the patent applications which led to the Collie Portfolio.

87. Any benefit from using the NS Design Suite, including filing of the Collie Portfolio, was, by contract, for the benefit of North Sails, which includes ownership of the '089 Patent.

88. Collie "acknowledge[d] and agree[d] that breach by him of his obligation under this Confidentiality Agreement shall cause North [Sails] irreparable injury for which there is no adequate and complete remedy at law…. North [Sails] shall be entitled to … injunctive and other equitable relief." *Id.*

89. Therefore, the Collie Portfolio is rightly owned by North Sails.

90. On information and belief, at all relevant times, Collie was an agent of TNZ and was acting at the direction of TNZ, and TNZ is therefore liable for Collie's violations of the Confidentiality Agreement.

91. The resulting impact of the breach of contract includes the financial damages incurred by North Sails, as well as any other damages, due to TNZ's claims to, and threats related to, the Collie Portfolio.

**COUNT III – Unjust Enrichment**

92. North Sails incorporates its allegations in all other paragraphs as though fully set forth herein.

93. North Sails conferred a benefit on the Defendants by providing them access to valuable confidential, proprietary information and intellectual property of North Sails.

94. Defendants accepted and retained North Sails' valuable property and used it to their own advantage at North Sails' expense.

95. On information and belief, TNZ has sold licenses to the Collie Portfolio to others.

96. TNZ has been and continues to be unjustly enriched by profiting from the wrongful conduct described in this Complaint. In particular, TNZ has made wrongful use of North Sails' property by asserting inventorship, failing to name Savage as a co-inventor, including North Sails' confidential information in the Collie Portfolio in violation of the confidentiality obligations owed by Collie to North Sails, and licensing the Collie Portfolio which includes North Sails' property. It would be inequitable for TNZ to retain the benefit of their wrongful conduct.

97. North Sails has incurred, and continues to incur, detriment as a result of the Defendants' wrongful use of North Sails' intellectual property rights, including the right to any patent based on North Sails' intellectual property, and to any patent documents (including assignment documents), U.S. or foreign, that belong to North Sails.

98. The intellectual property and associated rights, including the rights to any patents

based on North Sails' intellectual property (including the confidential, trade secret and proprietary information shared under the 2017 Confidentiality Agreement), and to any documents (including assignment documents), U.S. and foreign, are unique and there is no adequate remedy at law.

99. In fact, Collie "acknowledge[d] and agree[d] that breach by him of his obligation under this Confidentiality Agreement shall cause North [Sails] irreparable injury for which there is no adequate and complete remedy at law…. North [Sails] shall be entitled to … injunctive and other equitable relief." *Id.*

100. The harm to North Sails is and continues to be substantial and irreparable.

**COUNT IV – Invalidity**

101. North Sails incorporates its allegations in all other paragraphs as though fully set forth herein.

102. If North Sails is not to be afforded an ownership interest in the '089 Patent, due to the aforementioned assertion of infringement by TNZ, an actual controversy exists as to the validity of the claims of the '089 Patent. TNZ's assertions of infringement of the '089 patent are obviated if those claims are invalid.

103. The claims of the '089 Patent are invalid because they are anticipated or made obvious by prior art, including prior sale and public use, and various printed publications, patents and patent applications.

104. The claims of the '089 Patent are also invalid because the inventions allegedly patented therein are invalid under 35 U.S.C. § 112, due, for example, to the inclusion of terms such as "stiffness," "elasticity," "average stiffness," and "average elasticity," which are used in a manner that renders the claims indefinite.

105. Claims 1-23 of the '089 Patent are yet further invalid because the inventions allegedly patented therein lack written description and enablement for the full scope of the subject matter encompassed by the claims under 35 U.S.C. § 112.

106. Exemplary bases for the invalidity of the '089 Patent include but are not limited to the bases set forth in a) North Sails' *Petition for Post-Grant Review of U.S. Patent No. 12,110,089* (PGR2025-00062) filed on July 2, 2025, b) *North Sails Group, LLC v. Team New Zealand Ltd.*, Case No. R.G. 35443/2026 (Commercial Chamber, Court of Milan, Italy), filed on August 12, 2026, and c) the opposition by North Sails in the EPO regarding EP4277841 filed on June 24, 2026. These exemplary bases include invalidity based on anticipation or obviousness due to the prior sales of sails by North Sails to TNZ, prior public use of sails (such as the *Stars and Stripes '88* sail, and the Alinghi 2009-2010 sails), European Patent 0375111, U.S. Patent 5,038,700, European Patent 0271215, U.S. Patent 5,097,783, U.S. Patent 4,815,409, "*The Art and Science of Sails*" by Tom Whidden and Michael Levitt, "*Maximum Sail Power: The Complete Guide to Sails, Sail Technology and Performance*" by Brian Hancock, U.S. Patent 1,613,890, and U.S. Patent 4,064,821.

**COUNT V – Inequitable Conduct**

107. North Sails incorporates its allegations in all other paragraphs as though fully set forth herein.

108. If North Sails is not to be afforded an ownership interest in the '089 Patent, due to the aforementioned assertion of infringement by TNZ, an actual controversy exists as to the enforceability of the claims of the '089 Patent.

109. The '089 Patent is unenforceable due to inequitable conduct by Defendants before the U.S. Patent and Trademark Office ("PTO").

110. Each individual that is associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the PTO.

111. The duty of candor includes the requirement to disclose to the PTO all information known to that individual to be material to the patentability of the pending claims. 37 C.F.R. § 1.56(a).

112. Defendants, including Collie, and each TNZ employee and agent involved in the prosecution of the patent, their patent attorneys and patent agents (collectively, the "Prosecution Personnel") each had a duty of candor to the PTO.

113. Collie and the Prosecution Personnel knew of material information concerning sales of the invention prior to the filing of the 18/211,036 application and withheld that information with a specific intent to deceive the PTO.

114. Collie and the Prosecution Personnel had knowledge that Collie was not the only inventor of the 18/211,036 patent application and intentionally withheld that information.

115. Collie and the Prosecution Personnel had a duty to disclose information that is material to the patentability of the claims they were requesting that the PTO issue. 37 C.F.R. § 1.56.

116. During prosecution of the 18/211,036 application, Collie and the Prosecution Personnel did not disclose to the PTO that TNZ purchased sails from North Sails that embody all of the features of sails claimed in the '089 Patent, at least as early as February 2019, over a year before the 18/211,036 application was filed.

117. TNZ's purchase of sails from North Sails that incorporated the sail structure of the '089 Patent at least one year before the filing date of the 63/127,127 provisional application invalidates all the claims of the '089 Patent.

118. Collie and the Prosecution Personnel knew of the withheld material information of such sale, and withheld the information with intent to deceive the PTO.

119. Collie and the Prosecution Personnel also fraudulently failed to disclose that Matt Savage was an inventor of the ’089 Patent.

120. At least the failure by Collie and the Prosecution Personnel to disclose to the PTO such sale was material to the prosecution and would have prevented the ultimate allowance of the application. The Patent Examiner would have used that information to deny the ’089 Patent because sale of the claimed invention more than one-year prior to the filing date of the earliest application a claim is entitled to claim priority to U.S. provisional application is a statutory bar to patentability under 35 U.S.C. § 102(a)(1), even if an exception under 35 U.S.C. § 102(b)(1) applied. This information would have led to the rejection of the 18/211,036 application, which would not have issued but for the withholding of the sale.

**COUNT VI – Unfair Competition and Unfair Trade Practices**
(in violation of the Connecticut Unfair Trade Practices Act (CUTPA))

121. North Sails incorporates its allegations in all other paragraphs as though fully set forth herein.

122. TNZ has engaged in unfair, deceptive, immoral, oppressive, and unscrupulous practices in the conduct of trade or commerce in violation of CUTPA. In bad faith, TNZ has used the Collie Portfolio to interfere with North Sails’ relationships with its customers, in particular, providing sails to contenders for the upcoming 38th America’s Cup race. This includes not naming Matt Savage as an inventor of the ’089 Patent, not identifying North Sails as a co-owner of the ’089 Patent, and threatening North Sails and North Sails customers with objectively baseless infringement litigation involving the Collie Portfolio. TNZ’s tortious

interference with North Sails' existing and prospective customer relationships, as alleged below, further constitutes an unfair method of competition and an unfair or deceptive act or practice in violation of CUTPA.

123. North Sails' reputation for reliability, technical leadership, confidentiality, and freedom to supply all America's Cup teams is a critical component of its business and goodwill.

124. TNZ's July 31, 2026, and August 25, 2026 letters were sent not for the legitimate purpose of protecting valid patent rights, but for the improper purpose of disrupting North Sails' existing and prospective supply relationships with America's Cup teams and damaging North Sails' reputation as the trusted supplier of sails for America's Cup race teams. TNZ knew, or was willfully blind to the fact, that its infringement threats were objectively baseless because TNZ knew that the asserted patent claims were derived from North Sails' confidential information and inventions, that Savage was an omitted inventor, and that North Sails had sold sails embodying the alleged invention to TNZ more than one year before the earliest asserted priority date.

125. All of these actions were directed at North Sails, headquartered and with a principal place of business in Connecticut.

126. TNZ's actions have caused and continue to cause substantial injury to North Sails.

127. As a direct and proximate result of TNZ's unfair and deceptive conduct, North Sails has suffered and will continue to suffer damages, including lost sales and profits, costs incurred to reassure and support customers, costs incurred to address threatened infringement allegations, diversion of personnel, harm to goodwill, and injury to North Sails' reputation in the America's Cup and high-performance racing-sail markets.

128. TNZ's actions constitute unfair competition in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110g.

129. North Sails claims damages, enhanced damages, and an award of attorneys' fees as set forth under Conn. Gen. Stat. 42-110g.

**COUNT VII – Tortious Interference with Business Relationships and Prospective Economic Advantage**

130. North Sails incorporates its allegations in all other paragraphs as though fully set forth herein.

131. North Sails has existing and prospective business relationships with the America's Cup teams, including the teams competing in America's Cup 38, for the design, manufacture, and supply of racing sails.

132. TNZ knew of those relationships. TNZ is a party to a North Sails supplier agreement, has been licensed to use the NS Design Suite, and has itself purchased sails from North Sails.

133. On July 31, 2026, TNZ sent a letter to those teams warning them not to use sails within the scope of the Collie Portfolio at America's Cup 38, and warning North Sails that its design, manufacture, or importation of such sails would infringe.

134. TNZ's infringement assertions were objectively baseless and made in bad faith. TNZ knew that the Collie Portfolio disclosures were derived from North Sails' confidential information, that Savage was an unnamed co-inventor, and that North Sails had sold TNZ sails embodying the claimed structure in 2019, more than one year before the earliest claimed priority date.

135. TNZ sent the letter to interfere with North Sails' customer relationships and with the intent to disrupt North Sails' supply of sails for America's Cup 38, not to protect any legitimate patent right.

136. In addition, on information and belief, TNZ induced and persuaded Collie to violate his contractual confidentiality obligations to North Sails.

137. As a direct and proximate result, North Sails has suffered actual loss, including lost profits, increased costs, loss of goodwill and harm to reputation. But for TNZ's actions, North Sails would not have suffered these losses.

138. TNZ's actions constitute tortious interference with business relationships and prospective economic advantage under Connecticut common law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, North Sails Group, LLC, respectfully requests the following relief:

A. That Matt Savage, an employee of North Sails, be declared a co-inventor of the '089 Patent;

B. That the U.S. Patent and Trademark Office be directed to correct inventorship to name Matt Savage as a co-inventor of the '089 Patent;

C. That North Sails be declared the owner of the Collie Portfolio and that TNZ be ordered to execute and file all necessary assignments of the Collie Portfolio to North Sails, in all relevant jurisdictions;

D. That the Court impose a constructive trust over all information, patent applications, patents, technology, products, and other materials in the possession, custody, or control of Defendants that wrongfully constitute, contain, were based on, and/or derived in whole or in part from the use of North Sails' intellectual property or confidential information, and that the Court issue an order that

Defendants immediately transfer to North Sails all right, title, and interest in such information, patent applications, patents, technology, and products.

E. That the '089 Patent be declared invalid and unenforceable;

F. That North Sails be awarded the amounts by which Defendants have been unjustly enriched by ownership of patents based on North Sails' confidential information.

G. That TNZ be held liable to North Sails, pursuant to CUTPA, and be directed to pay money damages, punitive damages, and attorneys' fees under Conn. Gen. Stat. § 42-110g;

H. That North Sails be awarded attorneys' fees on account of Defendants' inequitable conduct and the exceptional nature of this case under 35 U.S.C. § 285 and 28 U.S.C. § 1927;

I. That North Sails be awarded all damages caused by Defendants' conduct, including lost profits, lost sales, delayed or disrupted customer revenue, mitigation and customer-support costs, diminution of goodwill, reputational injury, punitive or enhanced damages where permitted, attorneys' fees, costs, and such further relief as the Court deems just and proper.

J. That North Sails be awarded its costs, including expert fees; and

K. That the Court award all such other and further relief in favor of North Sails as the Court may deem just and proper.

TRIAL BY JURY IS DEMANDED.

DATED: September 15, 2026

Respectfully submitted,

*/s/ Kathryn Mims*

**ALLEN OVERY SHEARMAN STERLING US LLP**

Kathryn Mims (VA Bar No. 81486)
Anna Stockamore (*pro hac vice* forthcoming)
1101 New York Avenue NW
Washington, DC 20005
Tel: (202) 508-8003
Kathryn.Mims@aoshearman.com
Anna.Stockamore@aoshearman.com

Thomas Makin (*pro hac vice* forthcoming)
A. Antony Pfeffer (*pro hac vice* forthcoming)
599 Lexington Avenue
New York, New York 10022-6069
Tel: (212) 848-7698
Thomas.Makin@aoshearman.com
Antony.Pfeffer@aoshearman.com

***Attorneys for Plaintiff***
***North Sails Group, LLC***